Barbara HANDSCHU, Ralph Digia, Alex McKeiver, Shaba Om, Curtis M. Powell, Abbie Hoffman, Mark A. Segal, Michael Zumoff, Kenneth Thomas, Robert Rusch, Anette T. Rubenstein, Michey Sheridan, Joe Sucher, Steven Fischler, Howard Blatt and Ellie Benzone, on behalf of themselves and all other similarly situated, Plaintiffs,

Rev. Calvin Butts, Sonny Carson, C. Vernon Mason, Michael Warren, Intervenors,

v.

SPECIAL SERVICES DIVISION, a/k/a Bureau of Special Services, William H.T. Smith, Arthur Grubert, Michael Willis, William Knapp, Patrick Murphy, Police Department of the City of New York, John V. Lindsay and various unknown employees of the Police Department acting as undercover operators and informers, Defendants.

No. 71 Civ. 2203 (CSH).

United States District Court, S.D. New York.

July 18, 1989.

Martin R. Stolar, Jethro M. Eisenstein, Paul G. Chevigny (Arthur Eisenberg, of counsel), New York Civil Liberties Union, New York City, for plaintiffs.

Jonathan C. Moore, New York City, for certain plaintiff class members.

Joan Gibbs, Stephanie Y. Moore, Margaret Ratner, New York City, Esmeralda Simmons, Wendy Brown, Brooklyn, N.Y., for intervenors.

Peter L. Zimroth, Corp. Counsel of the City of New York (Daniel Turbow, Tai Park, of counsel), New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Counsel for plaintiff class move to hold defendants in contempt and for related relief, alleging violations of the Guidelines embodied in the Stipulation of Settlement and this Court's Order approving them. The nature, history and resolution of this litigation are described in *Handschu v. Special Services Division*, 605 F.Supp. 1384 (S.D.N.Y.1985), *aff'd* 787 F.2d 828 (2d Cir.1986), familiarity with which is assumed. Separate counsel for those class members referred to as "The New York 8"[1] support class counsel's motion, as do counsel for other class members intervening separately (the "Intervenors").[2]

---

1. The New York 8 are a group of Black political activists who were accused of plotting various crimes and brought to trial in this Court in 1985 for alleged RICO conspiracy violations and firearms charges. The defendants in that trial were: Viola Plummer, Coltrane Chimurenga, Robert Taylor, Roger Wareham, Omowale Clay, Ruth Lateefah Carter, Yvette Kelley and Colette Pean.

After trial before District Judge Carter and a jury, all defendants were acquitted of the RICO conspiracy charges, but convicted of weapons possession charges. Judge Carter sentenced all defendants to probation and community service. In the case at bar, Jonathan C. Moore, Esq. appears as counsel for seven of these individuals: his papers do not refer to Yvette Kelley. However, for the sake of convenience this Opinion will refer to Mr. Moore's clients as the New York 8.

2. The intervenors, represented by counsel from the Center for Constitutional rights in Manhattan, and from the Center for Law and Social Justice of Medgar Evers College, Brooklyn, are the Reverend Calvin Butts, Sonny Carson, C. Vernon Mason, Esq., and Michael Warren, Esq.,

## BACKGROUND

The Stipulation of Settlement directed the promulgation and adoption of Guidelines to oversee the activities of the Public Security Section ("PSS") of the Intelligence Division of the New York City Police Department. The Guidelines themselves, established through negotiations between the parties, appeared as Exhibit A to the Stipulation. Section III of the Guidelines established an Authority to oversee the activities of the PSS. The three-member Authority consists of the Police Department's First Deputy Commissioner, the Deputy Commissioner for Legal Matters, and a civilian member appointed by the Mayor. At present the Authority consists of Richard J. Condon, the First Deputy Police Commissioner; Robert Goldman, Deputy Police Commissioner for Legal Matters; and the civilian mayoral appointee, Hon. Harold R. Tyler, Jr., an attorney presently in private practice and former United States District Judge and Deputy Attorney General of the United States.

Section V(A) of the Guidelines provides in part:

"At any time, a person or a member of a group or organization having reason to believe that such person, group or organization has been named in PSS files as a result of an investigation in connection with or related to his, her or its political activities, may request in writing which sufficiently identifies the requesting party that the Authority make an inquiry of the PSS. Upon receiving such a request, the Authority shall inquire of the PSS whether it maintains a file including the names of such person or group."

The section goes on to specify procedures the Authority must follow depending upon the results of its initial inquiry.

Section IV(C)(6) of the Guidelines provides that use of undercover personnel in investigations sanctioned by the Guidelines "will be permitted only after approval by the Authority." That section sets forth the procedure to be followed by the Authority

who are accurately characterized in their brief at 2 as "well known black New York City activ-

in respect of the approval of undercover activity.

In a letter dated July 1, 1987 to Police Commissioner Ward and Peter L. Zimroth, Esq., the Corporation Counsel of the City of New York, counsel for plaintiff class called attention to recent press accounts of police conduct which in class counsel's view violated the Guidelines and the Stipulation of Settlement. These press accounts referred to the taping and profiling of personalities speaking on radio station WLIB, a station which focuses upon news and expressions of opinion concerning the black community. Class counsel characterize their letter as the giving of notice under ¶ 6 of the Stipulation of Settlement, which provides:

"Counsel for plaintiffs shall notify defendants by certified mail of any claimed violation by defendants of the provisions of this stipulation. That notice shall specify the violation and shall be made to both the Office of the Corporation Counsel and the Police Commissioner. Counsel for plaintiffs agree to provide 30 days notice of any claimed violation by defendants of the provisions of this stipulation in order to give defendants a reasonable opportunity to cure such claimed violations as a condition precedent to moving to punish defendants for contempt."

On July 2, 1987, class counsel applied for and defendants consented to an order this Court entered temporarily restraining defendants from destroying any documents concerning the allegedly unlawful conduct. That order remains in effect.

On July 6, 1987 class counsel wrote to the Authority. That letter, purportedly invoking Section V of the Guidelines, requested the Authority to "make inquiry of the PSS concerning reports of investigations which have appeared in the press which appear do not conform to the Guidelines." Those reports included "but are not limited to":

"(a) The monitoring, taping and data collection from broadcasts of radio sta-

ists ..."

tion WLIB (See New York Newsday, Sunday, June 28, 1987, page 19);

(b) The operations of the PSS described in the New York Newsday report of Wednesday, July 1, 1987, to wit, the operation of a Black Desk, compilation of materials on black community leaders, monitoring of public gatherings and demonstrations, presence of undercover personnel in crowds and audiences at public activities, attendance at the meeting at Boys and Girls High School, investigations of Sonny Carson, the Rev. Calvin Butts and the New York 8;

(c) Use of PSS investigative information in Police training sessions (See New York Sunday News, July 5, 1987);

(d) All activities of the New York Police Department affecting plaintiff class from the effective date of the Settlement in *Handschu v. Special Services* and the September 3, 1986 effective date of Interim Order 51 which do not conform to the Stipulation of Settlement and Guidelines."

By letter dated July 13, 1987 Roger Wareham, one of the New York 8, wrote to the Authority requesting an inquiry as to whether police investigations of that group, also reported in press accounts, conformed with the Guidelines. The Authority considered that request within the ambit of class counsel's July 6 letter.

Upon consent of all parties, further litigation was stayed to permit the authority to conduct an inquiry and submit a report. Under date of October 8, 1987 the Authority submitted to the Court, with copies to counsel then of record and to Mr. Wareham, a 44–page report which I now consider in detail.

### The Authority's Report

The Authority's 44–page report was preceded by extensive interviews and document inspection which are summarized at R. 7–8.[3]

Before dealing with the four matters outlined in class counsel's July 6 letter, the Authority delivered itself of some preliminary observations.

First, the Authority expressed the view that certain of the inquiries lodged with it fell outside the scope of section V(A) of the Guidelines. The Authority observes that "the Guidelines nowhere expressly provide third parties with the right to trigger an inquiry by the Authority of several of the charges raised in the July 6 letter." R. at 2. The Authority characterizes as such inquiries the request that the Authority investigate press allegations that PSS operated a "Black Desk"; and a request that the Authority conduct an inquiry into "[a]ll activities of the ... Police Department affecting plaintiff class ... which do not conform to the Stipulation of Settlement and Guidelines." In the Authority's view, "neither of these matters is of the type which is properly the subject of a section V(A) letter", which is limited by the wording of the Guidelines to "a discrete inquiry from a particular individual or group to ascertain whether he or it is named in PSS files", R. 3. Nonetheless, given the amount of media coverage which resulted in these initial requests to the Authority, it conducted an inquiry into those matters, with the cautionary note "that in the future, and absent comparable compelling factors, we shall not routinely address broad, ill defined issues of this type merely upon the request of third parties, and shall generally limit our inquiries responsive to such requests to those properly raised under section V." R. 4.

Secondly, the Authority professed to find in several Guidelines provisions "substantial ambiguities ... [that] are not easily resolved." R. 6. Having perceived those ambiguities, the Authority concluded that "the Guidelines—as an ambiguous statute or regulation—must be construed in a manner which best preserves its purpose." The Authority's suggested construction is as follows:

"The Guidelines were not designed to prevent the obtaining of information necessary for *operational*—as opposed to *investigative*—purposes. Accordingly,

---

**3.** References designated "R." are to the Authority's report.

we suggest that, when testing police conduct under the Guidelines, we must look to the purpose of that conduct. That is, where it is unclear whether the information-gathering at issue is a violation of the Guideline's prohibition on the 'investigation of political activity,' the conduct should generally be proscribed if its purpose was to monitor or make a record of political views. On the other hand, such conduct should generally be permitted if it was designed to provide the police with data necessary to satisfy their day-to-day responsibilities of preserving the peace and providing a plethora of services to the community." R. at 6–7 (emphasis in original).

The Guidelines ambiguities necessitating such a construction are said by the Authority to arise from the Police Department's need, in order to perform its duties properly, to "know a great deal about the communities it serves." R. at 5. Section IV(B) of Guidelines speaks to that need, at least in part, when it provides:

"Upon receipt of information concerning a planned event, the PSS may conduct an event planning inquiry (EPI) in order to preserve the peace, deploy manpower for control of crowds and to protect the right of individuals to freedom of speech and assembly."

The Guidelines then set forth detailed procedures for the conducting of an EPI." But one of the ambiguities the Authority perceives in the Guidelines is the Guidelines' failure to "indicate clearly how, if at all, PSS or any other unit of the Department can affirmatively seek out the information which would trigger the creation of an EPI." And, the Authority continues, the "Guidelines are similarly ambiguous with respect to how they deal with efforts to gather other types of similar information or, indeed, with the basic need of any government agency to be aware of and analyze publicly disseminated information about various matters." R. 6.

These themes recur throughout the Authority's discussion of the points of inquiry in class counsel's July 6 letter.

### (1) *The Monitoring of WLIB.*

The first matter raised by the July 6 letter was "the monitoring, taping and data collection from broadcasts of radio station WLIB."

The Authority's inquiry revealed that in late April 1987, Robert J. Johnston, Jr., the Chief of the Police Department, learned that WLIB, an early morning talk show focusing upon the Black community, sometimes dispensed information relating to planned demonstrations and other community events. Johnston had an interest in learning about planned events discussed on WLIB, and so advised his executive officer, Deputy Chief Thomas P. Walsh. Chief Johnston has ultimate responsibility for preserving the peace and deploying police personnel to assure that violence does not occur. According to Johnston, two recent events—a demonstration and march to Mayor Koch's Greenwich Village residence and demonstrations at Dag Hammerskjold Plaza, Manhattan and Crown Heights, Brooklyn—sparked his interest in WLIB broadcasts, in aid of obtaining "information relating to demonstrations and actions which would aid him in carrying out" his responsibilities. R. 9. The Authority found that Johnston "had no desire to obtain information about any particular individual or group." *Ibid.*

In consequence of that interest, conveyed either by Johnston or Walsh, the Operations Unit of the Police Department taped WLIB from 8:00 a.m. to 11:00 a.m. on weekdays during the period April 28 until June 29, 1987. The tapes were sent to the office of the Chief of Department on a daily basis, and were kept under lock and key until returned for re-use each Monday. The Authority found that nobody ever listened to those tapes.

At the same time Operations began its taping, either Johnston or Walsh asked the Intelligence Division of the Department to tape WLIB. Apparently Intelligence, working from a different location than Operations, has better commercial radio reception. The Technical Unit of the Intelligence Division began taping WLIB on May 7, kept a copy of each tape, and sent the

original on a daily basis to the Office of the Chief of the Department. These tapes were made automatically. The Authority found that Intelligence did not review them.

On or about May 11 Deputy Chief Walsh decided that neither he nor his staff had time to listen to the entirety of each three-hour tape. Accordingly, Intelligence was asked to prepare synopses of the tapes. Intelligence received ˙ no written instructions in this regard nor criteria concerning the contents of the synopses. Intelligence officers instructed their subordinates that, in preparing the summaries, "they were to listen for: (a) announcements of demonstrations and meetings of interest to the Department; (b) commentaries. by community leaders relating to police activities; and (c) comments of members of the New York 8 organization." R. at 11.

From the week of May 11 until the week of June 22 the Protective Research Unit of PSS in the Intelligence Division prepared summaries of WLIB broadcasts on a weekly basis. Senior intelligence division personnel reviewed these summaries, and forwarded them to the Chief of the Department's office, as well as to the offices of the Commissioner and the First Deputy Commissioner. R. at 11–12 and 12 n. 8. Intelligence kept copies of the summaries in its general communications file. The Authority found that: "No records or reports were included in any files of PSS and no investigations regarding any individual speakers commenced as a result of their appearance on the programs." R. at 12. Walsh found nothing in the summaries of sufficient importance to call to the attention of Chief Johnston, who stated that he never saw them until the present dispute arose. Commissioner Ward directed that the taping and summarizing of the broadcast cease on or about June 29, 1987, presumably (although the Authority does not say so) upon publication of press accounts referring to the activity.

The Authority concluded that the taping of the WLIB broadcasts did not violate the Guidelines. The Authority further concluded that the Guidelines do not "absolutely prohibit the preparation of summaries of matters that appear in public media, including broadcasts." R. at 12. However, while in its view the PSS conduct in respect of WLIB was "not barred by the Guideline's specific terms", nonetheless "it was inappropriate for PSS to have prepared summaries containing, among other things, recitations of individual speakers' political views and for the Intelligence Division to have then maintained copies of those summaries." R. 13. The Authority expands upon these conclusions at R. 13–20, and concludes with a recommendation "to the Police Commissioner that, in the future, unless permitted by the Guidelines, should similar summaries be desired they be prepared and maintained by operational, and not intelligence units." R. 20.

## (2) The "Black Desk".

As noted, one of class counsel's requests in their July 6 letter was that the Authority investigate:

"The operation of the PSS described in the New York Newsday report of Wednesday, July 1, 1987, to wit, the operation of a Black Desk, compilation of materials on black community leaders, monitoring of public gatherings and demonstrations, presence of undercover personnel in crowds and audiences at public activities, attendance at the meeting at Boys and Girls High School, investiga-' tions of Sonny Carson, the Rev. Calvin Butts and the New York 8." ˙

After inquiry, the Authority found that there is presently no "Black Desk" or other specific unit "which exclusively investigates Black political organizations or community leaders." R. 22. There was a PSS unit denominated the "Black Desk" before 1975, which was then eliminated. The Authority points out that as a practical matter, Black field personnel worked together in authorized investigations of groups comprised primarily of Black individuals; but the Authority has found that "except as is necessary for investigational purposes or for efficient allocation of manpower, there is no division of PSS responsibilities along racial lines." R. 22.

Furthermore, the Authority concluded after inquiry that "PSS has not compiled materials on Black community leaders, monitored public gatherings or demonstrations, or used undercover personnel at such activities except in the course of legitimate investigations that were approved by this body." *Ibid.* That is to say, all investigations, the Authority concluded, were directed at specific targets and were authorized by the Authority.

In respect of the individuals referred to in the July 6 letter, the Authority said this: "Similarly, with respect to the specific inquiry concerning Sonny Carson and the Reverend Calvin Butts, we simply report, in accordance with section V(A), that if their names appear in PSS files as a result of any investigation in connection with or related to their political activities, any such investigation was conducted in conformity with the Guidelines. We would ordinarily make a similar report with respect to the inquiry concerning the New York 8. However, because the Department has already publicly announced that this group was the subject of an investigation properly authorized by the Authority, we merely affirm that statement." R. 23. (Footnote omitted).

The Authority then goes on to discuss "a peripheral, yet serious, issue" which arose during its inquiry under this heading. R. 23–28. That issue concerns the proper use and preservation of "information gathered during the course of an authorized investigation concerning individuals or groups which are not the initial target of that investigation." R. 24. I discuss that issue *infra.*

(3) *Use of PSS Investigative Information in Police Training Sessions.*

Newspaper articles noticed by plaintiffs' counsel reported that during the course of training sessions for high level Police Department personnel, information regarding the New York 8 was distributed and the names of various Black community leaders were "mentioned."

Having formed the view that, assuming the accuracy of these accounts, the Guidelines did not prohibit the activity, the Authority "did not conduct a thorough factual review of the matter", R. 29 n. 12. "Preliminary inquiries" revealed that:

while information concerning the New York 8 was provided at the training sessions by oral presentation and slides, no written "dossiers" or photographs were distributed. Moreover, the community leaders mentioned in the July 5 articles were not a planned topic of conversation at the sessions. Rather, their names apparently arose during question and answer periods.

Reverting to the text of the Guidelines, the Authority concluded that the Guidelines do not prohibit "the dissemination of information collected by New York Police Department personnel to other New York Police Department personnel", so that "even if information concerning the New York 8 collected by PSS was distributed training sessions" that conduct did not violate the Guidelines. R. 28. The Authority found "even less application" of the Guidelines to reports that certain Black community leaders were "mentioned" at training sessions, concluding on that point: "it is hardly surprising that the Guidelines simply do not address the propriety of police officers discussing individuals who have voiced well-publicized opinions about the Department." R. 9.

(4) *The Authority's Review of Police Department Compliance with the Guidelines.*

As noted, class counsel made a broad request that the Authority conduct an inquiry into "[a]ll activities of the New York Police Department" from the effective date of the settlement "which do not conform to the Stipulation of Settlement and Guidelines."

Notwithstanding its conclusion that the Guidelines do not expressly authorize such a review in response to such a request, the Authority noted the climate "following the media reports which precipitated the instant controversy", R. 30. The Authority states that in order "to assure that the Guidelines are not being violated", the Po-

lice Commissioner "directed that the Inspections Division conduct an inspection of *all* commands within the Patrol Services and Detective Bureaus to ascertain whether they improperly maintain documents or other information implicated by the Guidelines." *Ibid.* (emphasis in original). That inspection was conducted between July 14 and July 16, 1987. About 30 officers from the Inspections Division, including three captains and 11 lieutenants, went to each of the seven patrol borough commands, 18 zone commands, 75 patrol precincts, and 75 precinct detective units in the Police Department. At each location, the Report states, the inspecting officers:

> ... ascertained the nature of the files maintained by each command, and except for those files maintained personally by the commander or his staff members, or those maintained by the Community Affairs Unit in each command, examined those files at random. They examined every file maintained by each Community Affairs Unit.

R. 30–31.

The inspecting officers reported to the Authority, which states:

> We have reviewed the reports resulting from this inspection and the documents culled during its course and have interviewed one of the Captains who directed the process. We are confident that these efforts have provided us with adequate information to report reliably upon the extent of past Department-wide compliance with the Guidelines and to discuss and make certain recommendations with respect to a few "trouble spots" we perceive.

R. 30.

In its analysis of the inquiry, the Authority returns to a concern previously expressed. The inspecting personnel evidenced, the Authority states, "a recognition of the fact that it is frequently difficult to find a bright line between information gathered within 'the routine scope of normal community affairs activities,' and 'political intelligence gathering.' " R. 31. That observation prompted the Authority to consider police duties which fall under the heading of "Community Affairs." Each police precinct has a community affairs officer. These officers report through the chain of command and ultimately to the commanding officer of the Community Affairs division. The purpose of the Department's community affairs effort, as stated in its Administrative Guide, is:

> To develop mutual respect and understanding between the police and the people they serve and promote an atmosphere conducive to greater public cooperation and police effectiveness.

The community affairs officers in the field are at the cutting edge of this effort. These officers and their superiors are directed to respond to disorders, demonstrations, and racial conflicts and report concerning them; to maintain alphabetical files of "concerned individuals and organizations" and distribute such files to appropriate personnel; to investigate incidents of "racial tension or community unrest affecting police community relations" and report thereon; to become acquainted with the identity of key personnel and the objectives of organizations "interested in promoting civil welfare" within each command; and generally to keep the separate commands of the Department advised of community affairs problems. R. 32–33.

Returning to a view previously expressed in its report, the Authority states: "[W]e do not believe that police activities conducted by field personnel which are legitimately aimed at fulfilling such community affairs or related operational responsibilities should generally be proscribed by the Guidelines." The Authority expresses concern that such activities may require the collection of information "which, under the Guidelines' broad definition, constitutes an 'investigation' "; and that on occasion information collected by community affairs officers or other operational personnel "may concern what, under the Guidelines, might be deemed a 'political activity.' " R. 34. "Nonetheless", the Authority continues:

> ... as long as these activities do not touch upon the true evil which the Guide-

lines seek to address *i.e.*, the surreptitious collection of information for the *purpose* of monitoring, investigating or indexing an individual or group's constitutionally protected views, they should be permitted.

R. 34 (emphasis in original).

In the light of these principles, the Authority concluded that "the bulk of the files and documents retrieved during the course of the Inspection Division's inspection do not demonstrate Departmental violations of the Guidelines." R. 34. For the most part, the files retrieved during this inquiry constituted "legitimate 'Community Affairs' or operational data such as newspaper clippings about events or persons in the relevant command, photographs, flyers announcing demonstrations, incident reports on past demonstrations, and letters from community members asking for police assistance or related correspondence." *Ibid.* Materials retrieved during the inspection also included reports on public gatherings and demonstrations. In the Authority's view, most of these materials "were plainly proper since they did little more than advise appropriate non-PSS personnel of the publicly stated views of community members, alert them to possible future events, and reflect 'EPI-type' information relevant to operational concerns." Furthermore, such reports dealt with activities "conducted in a truly public form", where it could reasonably be assumed, "that the speakers knew or should have known that they were being heard by Department members." The Authority concluded that "the Guidelines do not prohibit practices which convey information concerning such publicly stated views to appropriate non-investigatory personnel."

But the Authority also advises that this inquiry unearthed reports of meetings which "appear to have been prepared by police officers who attended the meetings without disclosing their Department affiliation in circumstances in which the speakers would not have reason to expect a police presence." R. 35. The Authority expresses uncertainty "that this practice is prohibited by the Guidelines, but has recommended to the Police Commissioner that the practice cease, except in "rare instances where an overriding concern for public safety might outweigh these considerations." R. 36. An example is posed of police learning "of a massive indoor rally where planning for an immediate parade or public demonstration is taking place, and they are denied entrance and cannot obtain the necessary EPI information through any means other than 'surreptitious' attendance. Under such circumstances, where it is reasonable to believe that the public safety is threatened, attendance should be permitted." R. 36. To ensure that such an exception "does not swallow the rule", the Authority has recommended to the Police Commissioner that the latter direct the person seeking to attend a "closed" meeting obtain prior permission from the commanding officer of the PSS or his designee "unless time constraints make it impossible", and that the making and granting of the request be reduced to writing with copies forwarded to the Authority, together with any memoranda or reports prepared as a result of such attendance, such reports to contain only the categories of information set forth in section IV(B) of the Guidelines. R. 37.

The Authority also learned, as the result of this field investigation, that materials were being maintained in precinct and borough files "which bear the name of the person or group which the materials concern." The Authority sanctioned this procedure "if the files contain matters which are truly relevant to community affairs or related operational responsibilities", observing that this "may simply be the most administratively convenient method of filing." *Ibid.* However, to guard against a situation "where such and similar files may take on the aura of 'dossiers' ", the Authority has recommended to he Police Commissioner that "all community affairs and operational files be reviewed on a regular basis and information no longer truly necessary for the effectuation of legitimate 'community affairs' or other operational duties be disposed of in accordance with law." R. 38.

On the basis of this inspection, the Authority concludes that "as a general matter, the Department has complied with the Guidelines ..." R. 40. However, the Authority calls attention to three "discrete matters" meriting separate discussion. R. 40.

First, the inspection produced evidence of an investigation of political activity by an operational unit on the patrol borough level. The target of that investigation was also the target of an authorized PSS investigation; and the commanding officer of the borough level investigation reported on a regular basis to PSS. Given the Guidelines' reference in section IV(A) to investigations of political activity "through the PSS", and since this borough level investigation was conducted under PSS supervision and in furtherance of an authorized PSS investigation, the Authority concluded that there was no violation of the Guidelines. Nevertheless, the Authority recommended that in the future all authorized investigations should be conducted by PSS personnel, and that the files generated during the investigation in question be transferred to PSS for disposition.

Second, during the inspection a "high ranking officer on the patrol borough level ... voluntarily produced during the course of the inspection" a personal file containing information concerning a group which is the subject of an authorized PSS investigation, as well as photographs of a demonstration at which members of that group appeared, together with video tapes of the same event. The Authority reports that these photographs and video-tapes were apparently taken by operational personnel. The Authority had not ascertained why the photographs or video-tapes were taken. It expresses its belief that "any photographs or video-tapes taken for investigatory purposes should be taken only by PSS during the course of an authorized investigation", but also observes that "there are a host of reasons why such materials may be necessary to achieve legitimate operational objectives, including crowd control and training." R. 42. The Authority expresses its intent to submit a report to the Commissioner including recommendations "as to the circumstances under which video-taping and photographing to achieve such objectives should be circumscribed."

Finally, a detective voluntarily produced to the inspectors "a file he was personally maintaining containing information concerning a particular religious sect which has sometimes engaged in acts of violence." The Authority expresses uncertainty as to whether the Guidelines' purpose, to prevent the assemblage of information by the Department as an institution so that it cannot be retrieved or used for improper reasons, is defeated "when an individual police officer collects information for his own use, and that information is not transmitted, indexed, or maintained by any branch of the Department." R. 43. The Authority indicates that a further report would be made on this incident, noting that the last two matters appear to involve "individuals or groups who have committed, or have threatened to commit, criminal conduct." *Ibid.*

The Authority concludes with the expressed hope that its report would be of assistance in resolving the pending proceedings; and that its interpretations of the Guidelines would "facilitate ongoing compliance with both their spirit and letter." R. 44.

### (5) *Responses to the Report.*

Class counsel, intervenors, and the New York 8 express uniform dissatisfaction with the report. They contend that the Authority's response to specific incidents demonstrates a basis for holding defendants in contempt. They challenge certain of the Authority's broader announcements, particularly its characterization of the Guidelines as ambiguous and the proposed way of addressing the perceived ambiguities. They ask for evidentiary hearings on a number of issues, preceded by discovery. They raise particular claims relating to their own positions.

Defendants respond that the Authority's report demonstrates their compliance with the Stipulation and Guidelines, in letter and

spirit, and that the contempt motions should be denied.

## DISCUSSION

I will deal, in that order, with general considerations arising out of the Authority's report; the particular incidents discussed in that report; and additional issues raised by the motion papers.

### General Considerations Arising Out of the Report

(1) *The Triggering of Authority Inquiries.*

■ The Authority is correct in its observation that the Guidelines do not provide for general inquiries by third parties. The Guidelines require the Authority to respond to a written inquiry from a particular "person or a member of a group or organization having reason to believe that such person, group or organization has been named in PSS files as a result of an investigation in connection with or related to his, her, or its political activities ..." Section 5(a). The requests of class counsel that the Authority investigate press reports that PSS behaved in certain ways, or that the Authority investigate all activities of the Police Department not in conformity with the Settlement and the Guidelines, carried the Authority into broad and general inquiries which fall outside that body's responsibility or powers. Given the particular circumstances attendant upon these press reports, the Authority acted properly in responding to counsel's request. The Authority may wish at some future time to undertake a comparable inquiry. But it is not required to do so; and its response to these general inquiries does not imply a continuing obligation to respond to inquiries which do not conform to the requirements of section V(A).

(2) *The "Ambiguities" in the Guidelines.*

The Authority's perception of significant ambiguities in the Guidelines is emphasized by the briefs of the Corporation Counsel, who views the situation with a very considerable professed alarm.

But I find it odd to hear the Corporation counsel tell me that the Guidelines contain "substantial ambiguities", suffer from "exceptional over breadth" and "very real and readily apparent" ambiguities, and "are ambiguous, as a matter of law ..." Main brief at 2, 3, 5, 8. The Corporation Counsel did not talk that way when, after prolonged negotiations involving police officers of high rank, his office proposed that the Court approve the Guidelines as central to the settlement. The Corporation Counsel did not talk that way to the Second Circuit when, on the appeal prosecuted by dissatisfied class members, he successfully defended this Court's judgment approving the settlement and the Guidelines. One wonders how the appeals judges would have reacted if the Corporation Counsel had begun his argument: "These exceptionally overbroad Guidelines contain substantial, very real and readily apparent ambiguities, and are ambiguous a matter of law, but please approve them any way." One need not wonder what I would have said if the Corporation counsel had said that to me. Any rational trial judge—I cling to that self-characterization—would have said the Corporation Counsel: "Then why on earth are you imposing so infirm a resolution of the case?"

In point of fact, of course, nothing of the kind was said or suggested at that time. Corporation Counsel and the Police Department joined class counsel in urging the Guidelines upon this Court as balanced, fair, and—most pertinent in the present context—workable.

■ Therefore the timing of the these recent protestations is surprising. However, considering that they are voiced by that Authority charged with administering the Guidelines, I must consider whether the Guidelines are encumbered by significant ambiguities.

That consideration begins with the Guidelines' central directive and two key definitions which amplify its terms. The directive appears in Section IV(A):

"The Police Department shall not engage in any investigation of political activity except through the PSS of the Intelli-

gence Division or its successor and such investigations shall be conducted as set forth in these Guidelines."

"Political activity" is defined in Section II(A):

The exercise of a right of expression or association for the purpose of maintaining or changing governmental policies or social conditions.

"Investigation" is defined in Section II(C):

A police activity undertaken to obtain information or evidence.

Blending this language into a single sentence yields a distillation of the Guidelines' primary objective:

"Except through the PSS, and then only as set forth in these Guidelines, the Police Department shall not undertake activity to obtain information or evidence about the exercise by an individual or organization of a right of expression or association for the purpose of maintaining or changing governmental policies or social conditions."

With all due deference, I do not see troublesome ambiguities in such a scheme, thus articulated. The Guidelines' purpose and definitions may—and accordingly should—be read together to achieve a harmonious and unambiguous whole.

The key words lie at the center of that single sentence. The Guidelines regulate "activity" which police "undertake ... to obtain information or evidence about the exercise" of constitutionally protected rights of expression or association. The Guidelines address police purpose and method. Only activity undertaken for the purpose of learning about citizens' exercise of rights falls within the Guidelines; and their principal focus is upon surreptitious methods. The Authority correctly identified the "true evil" the Guidelines address: "The surreptitious collection of information for the *purpose* of monitoring, investigating or indexing an individual or group's constitutionally protected views ..." R. 34 (emphasis in original). That language captures the objective of the complaint in this action, which the parties summarize in the preamble to the Stipulation of Settlement:

"WHEREAS, plaintiffs have instituted this action, pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief for alleged violations of the 1st, 4th, 5th, 6th, 9th, 13th and 14th Amendments to the United States Constitution by defendants in gathering, maintaining and disseminating information resulting from investigations of persons' or organizations' political beliefs, opinions or associations by recruiting, soliciting or maintaining employees as members of or informants within political organizations, electronic eavesdropping and other forms of surveillance ..."

605 F.Supp. at 1417–18.

Whether particular police conduct violated the Guidelines may give rise to case-by-case dispute. But the Guidelines themselves contain no fundamental ambiguities. Certainly none are conjured up by suggestions that the Guidelines prevent police officers from listening to radio broadcasts or reading newspapers, or inhibit community affairs officers from their appointed and salutary rounds. Of course police officers may do these things. If doing them leads to the "receipt of information concerning a planned event", PSS may develop information pertinent to proper police conduct by conducting an EPI, so long as the Guidelines are complied with. Section IV(B). That is the unambiguous balancing of interests achieved by the Guidelines.

The Guidelines do not undertake to sanction or proscribe in detail each conceivable form of police activity. General declarations of rights and obligations, beginning with the Constitution itself, do not ordinarily do so. But the Guidelines' division between the purposes and methods of police activity which fall within their boundaries and those which do not is plain enough to advise the Department and citizenry alike of the navigational aids by which the constitutional course is to be steered.

Perceiving no significant ambiguity in the Guidelines, I decline to endorse the Authority's purportedly curative "construction", suggesting that "investigational" activity should "generally" be proscribed and

"operational" activity should "generally" be permitted, R. 6–7. That purpose-oriented analysis is not, of course, entirely inappropriate, given what I have just said, but a broad division of the "generally" proscribed and permitted, according to whether the conduct is characterized as "investigational" or "operational", raises the risk that a distinction in principle will swallow up the Guidelines in practice. I see no need for such a declaration, at least this early in the Guidelines' history, and much to counsel against it. Police conduct falling within the Guidelines is proscribed by the Guidelines if not consistent with them: not proscribed "generally", but proscribed, period.

### (3) The Gathering of Non–Target Information.

■ At R. 23–28, the Authority referred to Guidelines provisions which prohibit PSS from maintaining particular types of information about individuals or groups without the Authority's written permission; and preclude PSS from creating index cards or files on individuals or organizations based solely upon their political, religious, sexual, or economic preference." Sections VI(B), (C). Apart from those provisions, the Authority observes, "the Guidelines do not directly address the issue of what should be done with information gathered during the course of an authorized investigation concerning individuals or groups which are not the initial target of that investigation." R. 24. The case is posed of an authorized investigation of person A, who is observed at a meeting also attended by person B, who is not suspected of any wrongdoing. The observation of B, the Authority concludes, "is not improper under the Guidelines since it was made during the course of an authorized investigation. However, the question arises as to what should be done with the information gathered concerning person B." *Ibid.*

That question implicates the preparation of index cards which are central to PSS record retrieval procedures. Index cards name particular persons or groups, and contain cross-references to and a summary of documents containing information con-

cerning that person or group generated during the course of an authorized investigation. Index cards are arranged for ready retrieval. Because the Guidelines do not specifically address the circumstances under which an index card can be created, the Authority and police commanders have considered criteria governing the creating of index cards. The Authority concludes that:

"... the purpose of the Guidelines can best be met by directing PSS not to create an index card on a person who is not the target of an authorized investigation unless and until, during the course of that investigation, PSS develops specific information that the person is truly relevant to the investigation or which demonstrates the threat of criminal conduct." R. 25.

As the Authority recognizes, these criteria leave some room for interpretation. But the Authority has directed the Commanding Officer of PSS to review each index card when created, and to provide the Authority with periodic sampling of index cards created, with explanation for the basis for their creation. These criteria, not specifically attacked in the reply briefs, seem to the Court to be sensible, and the particular review procedures sufficient.

### (4) Surreptitious Attendance at Meetings.

■ As noted, the Authority's general inquiry into compliance with the Guidelines turned up reports of meetings which "appear to have been prepared by police officers who attended the meetings without disclosing their Department affiliation in circumstances in which the speakers would not have reason to expect a police presence." R. 35. While the Authority expresses uncertainty "that this practice is prohibited by the Guidelines", it is difficult to imagine conduct more squarely implicating them. The Authority has recommended to the Police Commissioner that "the practice cease", *Ibid,* and it was wise to do so. The Authority in its direction carved out an exception for "rare instances, of "overriding concern for public safe-

ty", exemplified by a hypothetical "massive indoor rally where planning for an immediate parade or public demonstration is taking place", and EPI information is refused through normal channels. This combination of circumstances seems rather unlikely, although the procedures recommended by the Authority to deal with them if they arise are appropriate. But the positing of extreme hypotheticals must not obscure the Guidelines' key requirement that personnel conducting an EPI "shall identify themselves as police officers and explain the reason for the interview." Section VI(B).

(5) *Maintenance of Files in the Field Bearing the Names of Persons or Groups.*

■ I agree with the Authority that if files maintained in the field contain materials generated by community affairs activities, or other police activity not undertaken to obtain information about protected rights, the Guidelines neither prohibit nor control such filings. The authority's recommendation to the Police Commissioner that such files be reviewed on a regular basis and winnowed out is approved.

(6) *Investigation of Political Activity by Operational Units.*

Having learned during the field inspection of an investigation of political activity by an operational unit, albeit under PSS supervision and in furtherance of an authorized PSS investigation, the Authority recommended that all future authorized investigations be conducted by PSS personnel, and that the files generated during the investigation in question be transferred to PSS. That was the proper recommendation for the Authority to make.

(7) *Personal Files.*

During the field inspection two individuals, one a "high ranking officer on the patrol borough level" and the other a "detective", voluntarily produced personal files. The officer's file contained information of a group targeted by an authorized PSS investigation, together with photos

and videotapes of a demonstration at which members of the group appeared. Evidently the photographs and videotapes were taken by operational personnel. I certainly endorse the Authority's view that photographs and videotapes taken for investigatory purposes should only be taken by PSS during the course of an authorized investigation. I have some difficulty with the Authority's observation that such materials "may be necessary to achieve legitimate operational objectives, including crowd control and training." There is no indication that the photographs and tapes in question where taken or preserved by the "high ranking officer" for such non-controversial purposes; and one would think that photographs or tapes of demonstrations by groups who are not targets of investigations would do just as well. The Authority expressed its intent to submit a report to the Commissioner on the taking of videotaping and photographs to achieve operational objectives. That may be an appropriate point of inquiry in the possible Court overview which I discuss in the concluding section of this Opinion. The same applies to the detective's personal file containing information about "a particular religious sect which is sometimes engaged in acts of violence", where the Authority also indicated that a further report would be made. I do not share the Authority's doubt as to whether the Guidelines have nothing to do with the retention by individual police officers of such files. Blanket acceptance of that proposition carries an unacceptable risk of evasion of the Guidelines' purposes.

The Particular Incidents Discussed in the Report

(1) *The Monitoring of WLIB.*

■ Accepting Chief Johnston's statement to the Authority that concern for public order and crowd control caused his initial order to listen to and tape WLIB, it is clear that by the time that order filtered down to the PSS the message was garbled. The briefs of class counsel and intervenors show that many of the summaries maintained by Intelligence related to protected expressions of opinion by individuals, unrelated to planned meetings or other

sources of operational concern. *See* Ex. 3 to Moore affidavit. The Authority regards the preparation and retention of such summaries as "inappropriate", although "not barred by the Guidelines' specific terms." But the monitoring of a radio program for the expression of political or social views, followed by the preparation of summaries and their retention in intelligence files, constitutes an "investigation" as defined by the Guidelines, namely, "police activity undertaken to obtain information or evidence" about the exercise of the right of expression for political ends. Accordingly this conduct violated the Guidelines. I direct that the resulting summaries be destroyed.

Nothing in the Guidelines or this Opinion prohibit the police from watching news or public affairs programs on television, listening to the radio, or reading the newspapers. As the WLIB summaries themselves demonstrate, the police may thereby obtain information of assistance in discharging their responsibilities. *See, e.g.,* an entry in the WLIB summaries for May 21, 1987:

> Phil Sales (Committee to commemorate Afro–Liberation Day) asks for a large turnout on May 23 at ASA Phillip Randolph High School West 135th Street and Convent Avenue 9 A.M.. Following forum, participants will march east on West 135th Street to Malcolm X. Boulevard, then south to State Office Building.

Police may of course take appropriate action in response to publicly disseminated information, so long as they conform to the Guidelines where applicable, and other requirements of law.

(2) *The "Black Desk".*

I accept the finding of the Authority that no "Black Desk" *per se* exists within the PSS, in the sense of a division of PSS responsibility along racial lines. The practical requirements of field assignments referred to by the Authority are plausible. The existence of a "Black Desk" was suggested in newspaper accounts, which I may judicially notice are not always entirely accurate.

The Authority's response with respect to the inquiries of particular individuals is dealt with in other parts of this Opinion.

(3) *Police Training Sessions.*

I agree with the Authority that the newspaper accounts triggering these inquiries do not describe police conduct which implicates the Guidelines.

Additional Issues

(1) *Claims of the New York 8.*

The New York 8 claim that they are the subjects of illicit police surveillance. They ask for a finding of contempt, preceded by discovery.

The issues arise in this fashion. On July 1, 1987 Police Commissioner Ward held a news conference to deny press reports of a "black desk" within the Intelligence Division and to discuss his order stopping police monitoring of station WLIB. *The New York Times'* account of that press conference in its July 2 editions stated in the first paragraph that Ward, "in a highly unusual move, revealed yesterday that the New York City Police Departments' intelligence division was conducting an undercover investigation of a group of self-proclaimed black revolutionaries he called the 'New York Eight.'" The Times expanded on that subject in the body of the article:

> The New York Eight are a group of radicals who were accused of plotting to free two men imprisoned for the 1981 Brinks armored-car robbery in Rockland County, N.Y. The radicals, who include Viola Plummer, Coltrane Chimurenga and Roger Wareham, were acquitted in 1985 of the conspiracy charges, but they were convicted of illegal weapons possession and sentenced to community service and placed on probation.

> Mr. Ward refused to say on precisely what ground the department was investigating the group.

> He said the investigation was being conducted in line with a recent court agreement that settled a 16–year–old civil rights suit against the department.

> The settlement, known as the Handschu agreement after one of the plaintiffs, limits strictly the department's monitoring of political activity. On the panel are the first deputy police commissioner,

Richard Condon; the deputy commissioner for legal matters, Robert Goldman, and a former Federal judge, Harold Tyler.

Mr. Condon said yesterday that the group had approved the investigation of the New York Eight, but would not say when it began.

■ As noted, class counsel's letter to the Authority of July 6, 1987 included in its requested areas of inquiry the operation of a "Black Desk" and "investigations of Sonny Carson, the Rev. Calvin Butts and the New York 8." I have quoted the Authority's response (R. 23) at p. 14 *supra*. As to Mr. Carson and the Reverend Mr. Butts, the Authority reported "in accordance with section V(A) that if their names appear in PSS files as a result of any investigation in connection with or related to their political activities, any such investigation was conducted in conformity with the Guidelines." The Authority then added with respect to the New York 8:

> We would ordinarily make a similar report with respect to the inquiry concerning the New York 8. However, because the Department has already publicly announced that this group was the subject of an investigation properly authorized by the Authority, we merely affirm that statement.

By that response, the Authority also intended to deal with inquiries addressed to it by Roger Wareham, one of the New York 8.

In these circumstances, counsel for the New York 8, supported by the intervenors, make two points. First, it is said that the Authority's response does not take the form required by the Guidelines. Second, the members of the New York 8 contend that their surveillance is not in conformity with the Guidelines, but rather is prompted by the individuals' "[r]evolutionary rhetoric, criticism of the conduct of the department, or [police] frustration at the outcome of judicial proceedings", Main Brief for New York 8 at 9. Counsel submit affidavits and exhibits which they regard as evidence of the truth of those assertions. They ask for an evidentiary hearing into

the circumstances of and authority for any surveillance of them, preceded by "the broadest possible pre-hearing discovery," and they pray *inter alia* for a direction to the defendants "to cease their unauthorized investigation" of them. *Id.* at 16, 17.

The first contention depends on the assertion that the Authority used unclear or insufficient language in responding to the inquiry about the New York 8. The Authority correctly noted that the Police Department had "already publicly announced that this group was the subject of an investigation properly authorized by the Authority ..." This was a reference to Commissioner Ward's statement to the press on July 1, 1987. The Authority then added: "we merely affirm that statement."

When a person or an organization asks the Authority to make an inquiry of the PSS to determine compliance with the Guidelines, "the Authority shall inquire of the PSS whether it maintains a file including the name of such person or group." Section V(A). The inquiry may yield one of three results: (1) no such file exists or appears; (2) a file exists, and the Authority's inquiry reveals that an investigation was conducted in conformity with the Guidelines; or (3) a file exists, and the Authority ascertains that an investigation was conducted, but not in conformity with the Guidelines. If the inquiry reveals either the first or second sets of circumstances, Section V(A) specifies the Authority's responsibility:

> If such file does not exist (appear) or if the authority's inquiry reveals that an investigation was conducted in conformity with these Guidelines, the Authority shall notify the requesting party that if such an investigation was made it was conducted in conformity with these Guidelines.

The Authority reaches that conclusion only after the PSS discloses to the Authority whether an investigation has been conducted, and if so, the manner in which it was conducted and the information gathered. If the Authority ascertains that an investigation was conducted, but not in conformity with the Guidelines, then the Authority

inquires into the reasons of non-compliance, submits a report to the Police Commissioner for disciplinary measures, and determines the disposition of any information improperly acquired, a process which includes notification to the subject individual or group of the occurrence of a non-complying investigation, and giving the subject the right to inspect improperly acquired material, followed by further evaluation with respect to retention or disposition. Section V(B).

At first blush, the Authority's incorporation by reference of Commissioner Ward's public announcement "that [the New York 8] was the subject of an investigation properly authorized by the Authority", followed by the declaration that "we merely affirm that statement", could be read as compliance with the Guidelines notification machinery, albeit in shorthand form. Indeed, the defendants say that is so, and characterize the New York 8's criticisms as semantic and frivolous. But there is more substance to the point than that, although the Authority's choice of wording furnishes no basis for holding the defendants in this litigation in contempt. I agree with counsel for the New York 8 that the Authority's response in respect of them is inadequate and must be clarified. As Wareham states in his affidavit without contradiction, he and his co-defendants adopted the name "New York 8" to publicize the issues surrounding their arrest and prosecution in the case eventually tried before Judge Carter. *See* p. 1291 n. 1, *supra.* After the trial, these individuals have continued to use the term as means of identification when doing public speaking; but since that time, no formal organization known as the New York 8 has existed. Wareham affidavit at 7–8. Each of the seven individuals represented in these proceedings by Mr. Moore is entitled to a separate Section V(A) response from the Authority, as is that group (however unstructured) which has come to be known as the New York 8. As to each of those individuals, and as to that group, the Authority is directed to make a response consistent with the requirements of Section V of the Guidelines. That is a more complete

and appropriate notification, rather than the Authority's prior affirmation of the Police Commissioner's public statement, limited as it was to the group alone.

The Authority is directed to forward to counsel for the seven individuals and the group further notifications consistent with this opinion within thirty (30) days of the date of this Memorandum Opinion and Order, unless that time is enlarged for good cause shown.

■ The second contention made by the New York 8 is that they are entitled to discovery and an evidentiary hearing to determine whether surveillance or other police conduct directed towards them conform to the Guidelines. I will assume for this discussion that the Authority, in response to the direction just made, will report that if these individuals' or the group's name appear in PSS files as a result of any investigation in connection with or related to their political activities, the investigation was conducted in conformity with the Guidelines. The New York 8 asks, in effect, a *de novo* review in the District Court of the Authority's determination of conformity.

Neither the Stipulation of Settlement nor the Guidelines contain an express provision for judicial *de novo* review of a Section V(A) response by the Authority. Nor will such an entitlement be implied. To do so would distort the balanced result achieved by this litigation.

■ It is appropriate to begin the analysis by asking whether the defendants would have agreed to the settlement if it was understood that an individual or group could test the Authority's determination of Guidelines compliance by *de novo* review in the District Court, preceded by discovery. That is an appropriate inquiry when one purports to find in stipulations of settlement rights or obligations not expressly stated. *See Alliance to End Repression v. City of Chicago,* 742 F.2d 1007, 1016 (7th Cir.1984) ("A rational litigant does not give up in a settlement more than he can expect to lose at trial."). If claimants at bar are correct, a target of an authorized investiga-

tion may obtain full discovery of police inquiries and their fruits by simply claiming that the investigation should not have been authorized. Moreover, the Court would supplant the Authority as the Guidelines administrator in all instances (undoubtedly frequent) where such a claim is made.

The question posed by *Alliance to End Repression v. City of Chicago* is whether it is reasonable to suppose that the defendants would have agreed to such a resolution of this litigation. Clearly they would not. A right of review so broad and easily obtained would constitute an unprecedented judicial intrusion into police conduct, while compromising the security of ongoing investigations, not all of which can be assumed to violate the Guidelines. In this Court's opinion approving the settlement, attention was called to present case law granting latitude to police surveillance activities and limiting the federal courts' ability to intrude in the area by equitable decree. 605 F.Supp. at 1399–1403. Affirming that judgment, the Second Circuit remarked upon this Court's "determination that limitations on its equity power and important principles of federalism would not permit it to grant much of the injunctive relief that plaintiffs sought." 787 F.2d at 833 (citing cases). Defendants thus gave up litigation prospects containing the promise of continued unsupervised liberty in these areas for a code of conduct supervised by a body with a civilian component. As a result of that compromise, in the Second Circuit's words, plaintiff "obtained, not merely reasonable, but very respectable, concessions with respect to the New York City Police Department's 'latitude in the dispatch of its … affairs.'" *Id.* at 834 (citing and quoting *Rizzo v. Goode,* 423 U.S. 362, 379, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976)). Thus it is not accurate to say that if this right of review is not read into the Stipulation of Settlement and Guidelines, class members gained nothing of value. But it would be accurate to say that on these claimants' reading of the settlement, "they gave up nothing to settle the case

and the Department gave up everything." *Alliance to End Repression v. City of Chicago, supra* at 1016.

Class counsel do not agree with the Seventh Circuit's decision in *Alliance,* but contend that in any event the decision was based on a full evidentiary record, so that it furnishes no guidance here. But that is not true of the particular point under discussion. The existence *vel non* of judicial *de novo* review following the Authority's determination of conformity is a question of law, requiring no factual exposition, but in whose proper resolution the *Alliance* analysis furnishes useful instruction.

Accordingly these aspects of the New York 8's claims will be denied.[4]

### (2) *Claims of the Intervenors*

The brief for the Intervenors supports class counsel and the New York 8 in various arguments which are dealt with in other parts of this opinion. However, Intervenors make one argument particular to them.

■ Intervenors say in their brief that they have suffered injuries as a result of illegal surveillance and other acts of misconduct by the New York City Police Department. To redress those injuries, intervenors say they "have filed a Notice of Claim with the appropriate agency and intend to file an action for monetary and injunctive relief in state court." Brief at 14. In the context of this contempt proceeding, Intervenors seek a declaratory judgment from this Court that "the settlement in the instant case, and the ruling whether it has been violated by the defendants, will not preclude them from pursuing their claims in their selected forum." *Ibid.* Intervenors go on to cite cases dealing with issue preclusion and related matters, in support of that application. Defendants resist the requested declaration.

I agree with defendants that a declaration concerning issue preclusion by a court certifying a class action, for intended use in

---

**4.** Precluding this form of judicial review does not foreclose future findings of contempt by defendants for violation of the Guidelines if demonstrated by events.

future litigation in another court, is not procedurally viable. Federal class action litigation is governed by Rule 23, F.R. Civ.P. In the case at bar, this Court certified a class pursuant to Rule 23(a), (b)(1)(A) and (b)(2). 605 F.Supp. at 1388. Rule 23(c)(3) deals with the effect of judgments in class actions. The Advisory Committee's Note to the 1966 amendments to Rule 23 states: "Although thus declaring that the judgment in a class action includes the class, as defined, subdivision (c)(3) does not disturb the recognized principle that the court conducting the action cannot predetermine the *res judicata* effect of the judgment; this can be tested only in a subsequent action." The typical application of that rule is "to narrow the scope of a class judgment if, e.g., notice or representation of class interests was inadequate." *Taunton Gardens v. Hills*, 557 F.2d 877, 878 (1st Cir.1977). In the case at bar, the Intervenors do not argue for the narrowing of the Settlement's scope so as to exclude them; rather, they contend that the settlement should not be interpreted as precluding future state court claims. But the inhibition against the class certification court determining the effect of its own judgment in subsequent litigation applies by fair analogy. That is particularly true within the context of state court litigation contemplated but not yet initiated, and potential defenses not yet raised. Thus a lack ripeness compounds the class certifying court's traditional limitations in passing upon the *res judicata* or preclusive effects of the class action judgment.

Accordingly I deny the Intervenors' motion for a declaratory judgment of non-preclusion, leaving that issue to the state courts if the issue arises. No doubt the state courts will have in mind this Court's *res judicata* discussion in the opinion approving the Settlement ("Effect of the Settlement upon Past and Future Claims", 605 F.Supp. at 1406–08), as well as the Second Circuit's observations at 787 F.2d 834.

## CONCLUSION

### Contempt

A court has the inherent power to hold a party in civil contempt in order "to enforce compliance with an order of the court or to compensate for losses or damages." *Powell v. Ward*, 643 F.2d 924, 931 (2d Cir.1981), citing and quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499–500, 93 L.Ed. 599 (1949). The defendants at bar are accused of noncompliance amounting to contempt. An order of contempt is proper only if the prior order is clear and unambiguous, the proof of noncompliance is clear and convincing, and the defendant has not been reasonably diligent and energetic in attempting to accomplish what was ordered. *Powell v. Ward, supra*, at 931 (collecting cases); *see also Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 646 F.2d 800, 808 (2d Cir.1981).

While I have concluded that in respect of the WLIB monitoring the Intelligence Division departed from the Guidelines, I deny the several motions to hold defendants in contempt on this record. The Guidelines mandated a significant change in police investigatory procedures. While I do not share the defendants' perception of a fundamental investigatory/operational ambiguity in the Guidelines, some uncertainties in implementation were almost inevitable in the early stages of such a program. The report of the Handschu Authority reflects the considerable efforts that body and the Department are making to ensure the achievement of the Guidelines' purposes (which do not include some of the purposes urged in the present motions). This opinion endorses certain recommendations made by the Authority to make the Guidelines work better, and directs the taking of additional steps. There is presently demonstrated no clear and convincing evidence of defendants' noncompliance with the Court's order; nor am I persuaded that defendants have not been reasonably diligent and energetic in attempting to accomplish the purposes which underlie the Guidelines.

Accordingly the motions to hold defendants in contempt on the basis on the conduct discussed in this Opinion are denied. A separate motion to hold defendants in

contempt because of document retrieval problems is discussed in a separate Memorandum Opinion and Order.

### Possibility of Court Oversight

Although I conclude that no basis for an order of contempt appears from the present record, the Authority's report and the questions, issues, and recommendations contained therein suggest the possibility, which the Court now raises *sua sponte*, of closer judicial supervision.

The present review and reporting requirements appear in sections VIII and IX of the Guidelines. Section VIII requires the Intelligence Division Commander to review the PSS files every 12 months and submit a written report to the Authority in order "to determine to the fullest extent possible that no files are being kept which violate Guidelines." Section IX requires the Authority to prepare a report each calendar year giving statistical details with respect to the operation of the Guidelines. That report is "turned over to the Police Commissioner for submission to the Mayor." 605 F.Supp at 1424. *Quaere* whether the Court should not receive copies of those reports; and whether the Court should not take additional steps, *in camera* or otherwise, to assure compliance. I do no more than raise the question at this time. I invite briefs of counsel on that question, to be filed and served not later than September 30, 1989.

The motions to hold defendants in contempt are denied. The matter will proceed in accordance with the terms and directions set forth in this Opinion. It is SO ORDERED.